## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **JANICE CARMIENCKE** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| **v.** | * | |
| | * | **Civil No. PJM 05-3111** |
| **CARLOS GUTIERREZ, SECRETARY,** | * | |
| **UNITED STATES DEPARTMENT OF** | * | |
| **COMMERCE** | * | |
| | * | |
| **Defendants.** | * | |

## OPINION

Janice Carmiencke has filed a Complaint against her former employer, Carlos Gutierrez, Secretary of the Department of Commerce ("the Agency"), pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et. seq.* ("Title VII"). She alleges race discrimination in the form of failure to promote and retaliation for engaging in protected activities. The matter is before the Court on Gutierrez's Motion to Dismiss or, in the Alternative, for Summary Judgment. Since the Secretary has cited evidence outside the four corners of the Complaint, his Motion will be treated as a Motion for Summary Judgment. *See* Fed. R. Civ. P. 12(b). Carmiencke, now *pro se*,[1] opposes the motion. No hearing is necessary to dispose of this matter. *See* Local R. 105.6 (D. Md. 2006). Having considered the motions, the Court will GRANT Gutierrez's Motion.[2]

---

[1]     The Complaint was filed by counsel on Carmiencke's behalf.

[2]     Gutierrez's Motion to Dismiss is therefore MOOT.

**I.**

Carmiencke alleges *inter alia* that the Agency discriminated against her based on her race (Caucasian) when it denied her application for a promotion to a GS-14 supervisory budget analyst position.  She further alleges that after she filed a complaint with the Equal Employment Opportunity Commission (EEO), she was subjected to retaliation in the form of discipline and denial of performance-based cash bonuses.

The relevant facts are these:

Carmiencke was employed as a GS-13 budget analyst in the Office of the Chief Financial Officer (CFO) with the National Weather Service (NWS), a division of the Agency.  She was hired for this position in 1999 by Violet Foster, an African-American woman, who also served as Carmiencke's supervisor.  As a budget analyst, Carmiencke drafted policies and procedures and analyzed leases, reimburseables, grants and purchase requests.  As a team leader, Carmiencke received positive evaluations and would serve as acting supervisor when Foster was out of the office.

Prior to taking her position with the CFO, Carmiencke had served as a Budget Analyst, GS-12, in New York, a position for which Foster had also hired her.  At the time Foster and Carmiencke transferred to Washington, D.C., they considered themselves friends despite the supervisory relationship.  After the transfer, they would socialize at Friday night dinners with two other coworkers who had also transferred from the New York office, both of whom were white.

In June 2002, Foster was selected for promotion to NWS Comptroller and consequently her position as Supervisory Budget Analyst, GS-14 became available.  On August 6, 2002, the Agency issued a Vacancy Announcement for the position.  The duties for the position included managing

the NWS budget execution program, implementing the overall process throughout NWS and performing continual comprehensive analyses to determine the effectiveness of the program. Applicants submitted web-based applications on which they answered weighted questions. The applications were then scored. Applicants also received points for education, awards, training and experience.

Foster, the selecting official for the position, sought a candidate with strong leadership skills because the position was fast-paced, stressful and came with a heavy workload. After reviewing the applications and the accompanying scores, Foster decided to interview approximately eight candidates, one of whom was Carmiencke. At each interview, at least one other management official was present. However, the panel was not identical for all interviews conducted; only Foster was present at all interviews. All interviewees were asked the same questions, such as to describe his or her management style and how he or she would deal with a poor performer.

After the interviews, an African American male, Herbert Callands, was selected for the position. Callands had the third-highest score of 76 on the basis of Foster's review of his online application. Callands also possessed an MBA and had been a supervisory accountant for six years, as well as a budget analyst for six years prior to his position as an accountant. He had supervised as many as 18 people at once. Callands had a superior interview for the position. The notes made contemporaneously with his interview include the word "Excellent" at the top of the page underlined twice. In her deposition testimony, Foster elaborated that Callands had been expressive and clear in his answers. She was particularly impressed by his answers regarding how he would motivate his staff.

Carmiencke had received the highest score of 83 on the basis of the online application.  Her interview, however, was deemed unimpressive by Foster in her contemporaneous notes.  The interview notes suggest that when she was asked about her management style, Carmiencke responded that she would "do things by example, but if no results, get demanding."  When asked how she dealt with tight deadlines, her response was noted as: "Stress; depends on how many she has.  Tries to balance them, but doesn't usually miss them."

In addition to Carmiencke's less than sparkling interview, Foster was aware of potential problems with Carmiencke that Foster became aware of in her capacity as Carmiencke's supervisor.  First, Foster had concerns regarding Carmiencke's interpersonal skills, namely her ability to communicate with other staff members.  Carmiencke had frequently complained that other employees were incompetent and had repeatedly expressed frustration with lower-ranking employees who had asked for assistance on tasks Carmiencke felt they should be able to handle on their own.  Foster had also received complaints from Carmiencke's coworkers.  One employee, Brooks Holder, a Caucasian male, had indicated in an e-mail to Foster that he felt uneasy when speaking to Carmiencke and that her e-mails to him were "disparaging."  He wrote, "I want to know the reason for Janice to feel the need to informally document my responsibilities because it is very alarming" and further indicated that he sought "first and/or second line supervisory intervention" and had requested that Carmiencke not send further e-mails to him until he returned from a scheduled vacation.  Another employee, Mia Robinson, an African-American female, in an e-mail to Foster entitled "Conduct/Behavior of Janice Carmiencke," requested a meeting to discuss Carmiencke's behavior.  Robinson described Carmiencke as having approached her "like a raging bull in a manner which is unbecoming for a senior analyst/acting supervisor." Robinson complained

that Carmiencke had yelled at her at the top of her lungs. The relationship between Carmiencke and Robinson had deteriorated to such an extent that Foster scheduled a mediation to address the conflict.

In addition to these issues, Foster was concerned about Carmiencke's ability to handle stress. As a result of her a heavy workload, Carmiencke had become ill from overwork. Indeed, at one point she had taken a six week sabbatical due to illness from stress. Though Carmiencke considered herself overworked because she believed Foster held her to a different standard than lower-ranking African-American employees, thereby forcing Carmiencke to pick up their slack, Foster attributed the heavy workload to Carmiencke's inability to delegate tasks and to her poor communication skills. Having observed Carmiencke struggle with stress in her current position, Foster was hesitant to promote her to a position involving even greater stress. Accordingly, though Foster believed that Carmiencke was highly qualified, she felt that Callands was the best candidate for the position.

On September 20, 2002, Foster informed Carmiencke that she had not been selected, explaining the reasons for her decision, *i.e.* that she did not believe that Carmiencke could handle the stress of the position. On September 23, 2002, Carmiencke sought informal EEO counseling, alleging that a less-qualified African American had been selected for the position and that the reasons Foster gave for her non-selection were merely a pretext for discrimination. Both Foster and Callands became aware of the EEO Complaint at some point, though it is unclear when.

Callands became Carmiencke's supervisor on October 21, 2002. Eight days later she filed a formal EEO Complaint, claiming that she had been denied a promotion even though she was the most qualified candidate. From all appearances, Carmiencke continued to have skirmishes with her coworkers. One e-mail from an employee in another division complained that in a phone call with

Carmiencke, "Janice got so nasty with her," she had hung up on Carmiencke. Callands testified that he had to referee conflicts in the office and often to suggest that when she would get agitated, Carmiencke should take a break. Carmiencke would insist that, after explaining something once to an employee, she was not going to tell them how to do it again. From Carmiencke's perspective, the lower graded staff members who were African American had not been trained properly by Foster and were not being held accountable for their inability to perform their jobs. Despite these apparent problems, at her mid-term review on January 27, 2003, Carmiencke received a strong evaluation from Callands.

In March of 2003, Carmiencke refused to assist Callands in completing an assignment unless he would send her a written e-mail instructing her to do so. When Callands sought to have a private counseling conference with Carmiencke about the issue, she refused. In her deposition, Carmiencke explained that she refused only the "private" aspect of the conference because she felt Callands had "no integrity" and that she therefore had to have a third party present. Callands memorialized this dispute in a memorandum to both Carmiencke and Foster, characterizing Carmiencke's behavior as insubordinate. Other than the memorandum, no disciplinary action was taken.

On July 9, 2003, Foster sent an e-mail to the entire office reminding everyone to be professional by checking over their documents before sending anything out. Carmiencke responded by e-mail to everyone who had received Foster's e-mail: "I am a professional and take offense to blanket corrective action." When Foster replied to Carmiencke's e-mail, she indicated that the prior e-mail had been sent to the entire staff, and that Carmiencke's e-mails were "often hard to understand, or bordering on rude." Carmiencke replied, copying Callands and the Deputy CFO stating, "For the record. My remark stands." On July 24, in response to this exchange, Callands

provided a written letter of warning to Carmiencke, indicating that her "combative" e-mail was not "appropriate for office email" and that further misconduct on her part could result in disciplinary action. Carmiencke alleges that this letter was intended as harassment and was in retaliation for her EEO complaint.

Because he had assumed his position at the end of the 2002 rating period, Callands made no awards based on performance in the year 2002. Subsequently, however, he initiated award recommendations for Sue Bracey and Rozanna Staculli, both Caucasian. No award recommendation was made for Carmiencke.

In September 2003, Carmiencke left NWS and took a job with the Department of the Air Force as a Program Analyst, GS-13. She suffered no break in service.

On October 30, 2003, the EEO assigned Carmiencke's September 2002 complaint for investigation. In support of her claim, Carmiencke alleged that Callands had ridiculed her and made demeaning comments to her; that he gave African-American employees cash awards but none to her; that he had not provided her with assignment guidance whereas he did so with African-American employees; that he assigned her work that was previously assigned to African-American employees when it became past due or close to being due, then gave the African-American employees the credit and awards; and that during her midpoint-review Callands indicated that Carmiencke was not meeting performance expectations, but failed to give her a written evaluation. On August 3, 2005, the EEO determined that there were no material facts in dispute and granted the Agency's Motion for Summary Judgment.

## II.

A party is entitled to summary judgment if the evidence in the record "show[s] that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). While all justifiable inferences are to be drawn in favor of the non-movant, such inferences must "fall within the range of reasonable probability and not be so tenuous as to amount to speculation or conjecture." *Thompson Everett, Inc. v. Nat'l Cable Adver., L.P.*, 57 F.3d 1317, 1323 (4th Cir. 1995). Summary judgment procedure "is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (citation omitted). Trial judges have an "affirmative obligation . . . to prevent 'factually unsupported claims and defenses' from proceeding to trial." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (citing *Celotex*, 477 U.S. at 323-24). A court should enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. Where the plaintiff fails to meet this burden, the defendant should not be required to undergo "the considerable expense of preparing for and participating in a trial." *Hayes v. Hambruch*, 841 F. Supp. 706, 709 (D. Md. 1994) (Harvey, J.), *aff'd,* 64 F.3d 657 (4th Cir. 1995).

Even though intent is important in employment discrimination cases, the statutory purpose of summary judgment applies in no lesser degree to these cases than to other areas of litigation. *See Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985) ("The summary judgment rule would be rendered sterile, however, if the mere incantation of intent or state of mind would operate as a talisman to

defeat an otherwise valid motion").  In the employment discrimination context, a subjective, even if genuine, belief of discrimination will not shield a non-moving plaintiff from a grant of summary judgment.  *See Goldberg v. B. Green and Co.,* 836 F.2d 845, 848 (4th Cir. 1988).

## III.

To prove disparate treatment under Title VII, the plaintiff has the burden of establishing discriminatory intent.  If no direct evidence of discriminatory animus exists, the plaintiff may use the indirect burden-shifting proof scheme set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  Since Carmiencke has offered no direct evidence of discriminatory animus, this case is properly analyzed under the three-part *McDonnell Douglas* framework.

Under *McDonnell Douglas*, to establish a prima facie case of discriminatory non-selection, the plaintiff must show that: (1) she is a member of a protected group, (2) she applied for the position in question, (3) she was qualified for that position, and (4) the defendant rejected her application under circumstances that give rise to an inference of discrimination.  *Bryant v. Aiken Reg'l Med. Ctrs Inc.,* 333 F.3d 536, 544-45 (4th Cir. 2003).

If the plaintiff establishes a *prima facie* case, a presumption of discrimination arises, which the employer may rebut by articulating a legitimate non-discriminatory reason for its employment decision.  *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).  The employer's burden is merely one of production, not persuasion.  *Id*. at 255-256.  If the employer meets this burden, the presumption raised by the plaintiff's *prima facie* case is rebutted and the factual inquiry proceeds to a "new level of specificity."  *Id*. at 255.

-9-

At that point, the plaintiff must prove that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination."  *Id*. at 253; *see also Williams v. Cerberonics, Inc.*, 871 F.2d 452, 456 (4th Cir. 1989).   In proving pretext, the plaintiff must show not only that the employer's proffered reason was false, but that discrimination was the real reason for the employer's action.  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507-508 (1993).  The ultimate burden of showing that the employer intentionally discriminated against her remains at all times with the plaintiff.  *Burdine*, 450 U.S. at 253.

## IV.

Carmiencke claims that she was not selected for the GS-14 supervisory position as a result of race discrimination.  The Agency concedes that Carmiencke has established a prima facie case under *McDonnell Douglas*, but argues that it has provided a legitimate non-discriminatory reason for her non-selection.  Carmiencke argues alternatively that the Agency has not met its burden of production in support of the reasons proffered and that the proffered reasons are pretext for discrimination.  The Court disagrees.  The Agency has met its burden of production and has articulated a legitimate non-discriminatory reason for Carmiencke's non-selection, which she has not shown was pretextual.

## A.

First, the Agency has articulated a legitimate, non-discriminatory reason for Carmiencke's non-selection, namely that Foster chose the candidate she believed to possess superior leadership skills. Employers are free, within bounds, to choose the criteria by which they may assess their employees.  *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 648 n.4 (4th Cir. 2002).  When evaluating employees for promotion, an employer is entitled to consider interpersonal and

communication skills. *See Diamond v. Colonia Life & Accident Ins. Co.*, 416 F.3d 310, 320 (4th Cir. 2005) (allowing employer to consider such factors as "operations knowledge, business sense, decision making, communication skills, high degree of initiative, flexibility/openness, leadership skills, hands-on manager, and interpersonal skills").   While Carmiencke was considered a highly qualified candidate for the position, the Agency determined that she was not the best person for the job.  This determination resulted not only from the competitive qualifications and superior interview of Callands, but from the unimpressive interview Carmiencke gave, set against a history of coworker complaints about her.   The Agency has produced ample third-party evidence suggesting not only that Callands was well-qualified for the position, but that questions persisted regarding Carmiencke's interpersonal skills and ability to cope with stress.   Though Carmiencke argues that the Agency has not met its burden of production because it has not submitted SF50 Personnel Action documents, the Court finds that the employment applications, contemporaneous notes of interviews, depositions, EEO Documents and employee complaints that comprise the record are more than sufficient to meet the burden of production.

**B.**

In order to establish pretext, a plaintiff must show that the articulated reason is unworthy of belief or is unsupported by the record.  *See Burdine,* 450 U.S. at 256.   A plaintiff alleging discriminatory failure to promote may prove pretext by demonstrating that her "qualifications were so plainly superior that the employer could not have preferred another candidate." *Dennis,* 290 F.3d at 648 n.4.   Alternatively, such a plaintiff may show that the "totality of the circumstances establishes that the defendant's proffered reason, although factually supported, 'was not the actual reason relied on, but was rather a false description of its reasoning . . . manufactured after the fact.'"

*Id.* The Agency, however, has the discretion to choose among equally qualified candidates so long as the decision is not based upon unlawful criteria. *Id.*

In this case, Callands was certainly a candidate equal to or better than Carmiencke. Despite Carmiencke's fervent belief that she was the best candidate for the job, the evidence suggests that the Agency would have been entitled to decline to promote her, regardless of the identity of the candidate ultimately selected. Indeed, the evidence provided by the Agency illustrates that though Carmiencke was the superior candidate on the basis of her application score, her relationship with her coworkers was strained, a circumstance which would create a legitimate concern if she were promoted to a supervisory position over the very same workers. The evidence also shows that Carmiencke had a problem handling stress. Whether that stress was self-imposed because Carmiencke was unable to properly delegate work or whether it was imposed by demanding supervisors, Carmiencke's ability to deal with it would nonetheless be a factor in considering her for promotion. Carmiencke's own self-assessment does not suffice to counter this evidence of legitimate nondiscriminatory reasons for the failure to promote; what matters is "the perception of the decision-maker." *Taylor v. Brown,* 928 F. Supp. 568, 575 (D. Md. 1995) (quoting *Smith v. Flax,* 618 F.2d 1062, 1067 (4th Cir. 1980)).

Moreover, once again, the evidence shows that Callands was a highly appropriate candidate for selection. He had a superior interview, in which he provided specific examples of how he would motivate his employees. He possessed extensive budgetary, accounting and supervising experience. He received an outstanding appraisal. Simply because he ranked below Carmiencke in one aspect - the objective factors of the online application - does not demonstrate that he was less qualified for the job overall.

Finally, Carmiencke has presented no evidence that the Agency is failing to tell the truth about why she was not selected.  Though she may not be personally satisfied with the explanation, the totality of the circumstances dispels any racial motivation.  The Court notes in particular that Foster, an African-American, had selected Carmiencke, a Caucasian, on two prior occasions for positions, including the position that transferred her to D.C.  When the individual accused of the discriminatory action is the same individual who hired the employee, there is a strong inference against discrimination.  *See Proud v. Stone*, 945 F.2d 796, 798 (4th Cir. 1991).

## V.

Carmiencke is unable to establish even a prima facie case of retaliation.  She  submits that she was disciplined and denied cash awards in retaliation for filing her EEO complaint.  But in order to establish a prima facie case of retaliation, a plaintiff must show "(1) that she engaged in a protected activity; (2) that her employer took an adverse employment action against her; and (3) that there was a causal link between the two events."  *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 406 (4th Cir. 2005).  The second element has been recently modified by the Supreme Court to mean action by an employer that is  "materially adverse to a reasonable employee or job applicant." *Burlington No. & Santa Fe Ry. Co. v. White*, 126 S. Ct. 2405, 2409 (2006).  Though Carmiencke did engage in protected activity, she did not suffer an employment action that could be deemed materially adverse to a reasonable employee, nor did she prove that any of the actions she complains of flowed in any way from her EEO complaint.

## A.

A materially adverse employment action is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington*, 126 S. Ct. at 2415.  The

standard is designed to "separate significant from trivial harms." *Id.* The alleged harms that Carmiencke suffered - informal counseling, a letter of warning and the omission of cash bonuses - do not rise to the level of materially adverse. None of these actions seriously threatened her position, her continued receipt of salary or non-discretionary benefits or her authority as a senior-graded employee. Indeed, the disciplinary actions appear to have been the least oppressive measures available to Carmiencke's supervisors, given her difficult behavior. The events leading up to the disciplinary measures, namely Carmiencke's refusal to have a private conference with Callands and her mass e-mail response to Foster's e-mail, are well documented. Ultimately, these disciplinary measures and the apparently unrelated decision not to award her a cash bonus are not the kind of severe actions that would "deter employees from reporting employer wrong-doings out of a fear that they will suffer an adverse employment action." *Zackrie v. Lockheed Martin*, 2006 U.S. Dist. LEXIS 75191, No. RWT 04-1864 (D. Md. Sept. 28 2006). Instead, they were all actions appropriate for addressing disruptive or insubordinate behavior by an employee.

## B.

Assuming *arguendo* that the actions taken in respect to Carmiencke were adverse employment actions, no causal connection between those actions and Carmiencke's EEO complaint may be inferred from the mere fact that the allegedly retaliatory actions occurred subsequent to the date of the complaint. *See Olivares v. NASA*, 934 F. Supp. 698, 705 (D. Md. 1996) (to infer a causal connection merely from the fact that certain events follow an EEO complaint falls into "the classic post hoc ergo propter hoc fallacy"). The remoteness in time between the complaint of discrimination and the allegedly retaliatory action weakens any inference of causation. *See Hooven-Lewis v. Caldera,* 249 F.3d 259, 278 (4th Cir. 2001) (holding that six-month span between protected

-14-

activity and alleged retaliation was sufficient to negate inference).  Here, from the time of the filing

of the EEO complaint,  five months elapsed until the date of the counseling memorandum; seven

months passed until different employees other than Carmiencke (and both Caucasian) received a

cash bonus and eight months passed until Carmiencke received her letter of warning.  Though the

Court notes that both Foster and Callands possessed knowledge of Carmiencke's EEO Complaint,

the "mere knowledge on the part of an employer that an employee . . . has filed a discrimination

charge is not sufficient evidence of retaliation to counter substantial evidence of legitimate reasons

for adverse personnel action against that employee."  *Carter v. Ball,* 33 F. 3d 450, 460 (4th Cir.

1994).  The record is clear that the alleged retaliatory actions in this case, especially the counseling

and letter of warning, were legitimate responses to Carmiencke's problematic behavior.

## VI.

For all these reasons, Gutierrez's Motion for Summary Judgment will be GRANTED.  The

Motion to Dismiss is therefore MOOT.  A separate Order will ISSUE.


_____/s/_____
**PETER J. MESSITTE**
**November 7, 2006**                    **UNITED STATES DISTRICT JUDGE**